Richard D. McCune, State Bar No. 132124
rdm@mccunewright.com
David C. Wright, State Bar No. 177468
dcw@mccunewright.com
**MCCUNEWRIGHT LLP**
2068 Orange Tree Lane, Suite 216
Redlands, California 92374
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Joseph G. Sauder*
JGS@mccunewright.com
Matthew D. Schelkopf*
MDS@mccunewright.com
Joseph B. Kenney*
JBK@mccunewright.com
**MCCUNEWRIGHT LLP**
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
Telephone:  (610) 200-0581
*Pro Hac Vice* applications to be submitted

Attorneys for Plaintiffs and the Putative Class

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREG WALLIS and JODIE PELTIER, on behalf of themselves and all others similarly situated, | Case No.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | 1. Violation of the California Consumer Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*); |
| KIA MOTORS AMERICA, INC. and Does 1 through 10, inclusive, | 2. Violation of California Unfair Competition Laws (Cal. Bus. & Prof. Code § 17200); |
| Defendants. | 3. Violation of California False Advertising Law (Cal. Bus. & Prof. Code §§ 17500, *et seq.*); |
| | 4. Violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815, ILCS 505/1, ET SEQ. |
| | 5. Breach of Express Warranty; |

6. Breach of Implied Warranty;

7. Breach of Written Warranty Under the Magnuson-Moss Warranty Act (15 U.S.C. § 2301, *et seq.*);

8. Common Law Fraud;

9. Breach of the Duty of Good Faith and Fair Dealing; and

10. Violation of the Song-Beverly Act – Breach of Implied Warranty (Cal. Civ. Code §§ 1792, 1791.1, *et seq.*)

**<u>DEMAND FOR JURY TRIAL</u>**

# **TABLE OF CONTENTS**

*Page*

INTRODUCTION ...................................................................................................1

JURISDICTION .....................................................................................................3

VENUE ...................................................................................................................4

PARTIES..................................................................................................................4

    A.    Plaintiff Greg Wallis .................................................................................4

    B.    Plaintiff Jodie Peltier ...............................................................................6

    C.    Defendant KMA ......................................................................................7

CALIFORNIA LAW APPLIES .............................................................................8

TOLLING OF STATUTES OF LIMITATIONS ..................................................9

FACTUAL ALLEGATIONS ...............................................................................10

    A.    The Defective Engine Components within the Class Vehicles ...................10

        1.    The GDI Engines ...........................................................................11

        2.    The Hyundai GDI Recall ...............................................................16

        3.    Engine Failures Within the Class Vehicles...................................17

    B.    Defendant KMA's Knowledge of the Engine Defect ................................20

        1.    Complaints by Other Class Members ............................................23

            *a.*    *KIA GDI Engine Complaints* ............................................23

            *b.*    *Hyundai GDI Engine Complaints* ......................................29

    C.    KMA's Warranty-Related Practices ........................................................32

CLASS ALLEGATIONS ......................................................................................34

CAUSES OF ACTION .........................................................................................36

    COUNT I:  VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL
        REMEDIES ACT ........................................................................36

    COUNT II:  VIOLATIONS OF THE CALIFORNIA UNFAIR
        COMPETITION LAW .................................................................39

    COUNT III:  VIOLATION OF CALIFORNIA FALSE ADVERTISING
        LAW ............................................................................................40

    COUNT IV:  VIOLATION OF THE ILLINOIS CONSUMER FRAUD .............42

CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS (cont.)</u>

*Page*

COUNT V:  BREACH OF EXPRESS WARRANTY ............................................44

COUNT VI:  BREACH OF IMPLIED WARRANTY ...........................................45

COUNT VII:  BREACH OF WRITTEN WARRANTY UNDER THE
MAGNUSON-MOSS WARRANTY ACT ........................................................47

COUNT VIII:  COMMON LAW FRAUD ...........................................................49

COUNT IX:  BREACH OF THE DUTY OF GOOD FAITH AND FAIR
DEALING ........................................................................................................49

COUNT X:  VIOLATION OF THE SONG-BEVERLY ACT – BREACH OF
IMPLIED WARRANTY....................................................................................50

PRAYER FOR RELIEF ...............................................................................................52

CLASS ACTION COMPLAINT

## PLAINTIFFS' CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs Greg Wallis and Jodie Peltier (collectively "Plaintiffs') bring this action against Defendant Kia Motors America, Inc., ("KMA") and Does 1 through 10 (collectively "Defendant"), by and through their attorneys, individually and on behalf of all others similarly situated, and allege as follows:

## INTRODUCTION

1.     This is a class action lawsuit brought by Plaintiffs on behalf of themselves and a class of current and former owners and lessees with Theta 2.0-liter and 2.4-liter gasoline direct injection engines (the "GDI Engines") installed in certain Kia Optima, Sportage, and Sorento vehicles (the "Class Vehicles").[1]

2.     This action arises from KMA's failure to disclose to Plaintiffs and similarly situated consumers, despite its longstanding knowledge, that the engines in the Class Vehicles contain, *inter alia*, a latent defect that results in the restriction of oil flow through the connecting rod bearings, as well as to other vital areas of the engine.  This defect – which typically manifests itself during and shortly after the limited warranty period has expired – will cause the Class Vehicles to experience catastrophic engine failure and stalling while in operation.

3.     Significantly, the presence of this defect, resulting in restricted oil flow within the engines, poses a safety risk to the operator and passengers of the Class Vehicles.  The failure to have sufficient engine lubrication can cause complete and catastrophic engine failure while the Class Vehicles are in operation at any time and under any driving conditions or speed.  This exposes the driver and occupants of the Class Vehicles, as well as others who share the road with them, to an increased risk of accident, injury, or death.  As discussed further herein, numerous owners and lessees of

---

[1] Upon information and belief, the Class Vehicles include the following: MY 2011-2014 Optima, MY 2011-2014 Sportage, and MY 2012-2014 Sorento.  Plaintiffs reserve the right to amend or add to the vehicle models and model years included in the definition of Class Vehicles after conducting discovery.

CLASS ACTION COMPLAINT

the Class Vehicles have experienced engine damage and catastrophic failure while operating the Class Vehicles, thus placing themselves and those around them in immediate danger.

4.      Not only did KMA actively conceal the fact that particular components within the Class Vehicles' engines are prone to failure, they did not reveal that the existence of the defect would diminish the intrinsic and resale value of the Class Vehicles and lead to the safety concerns described herein.

5.      KMA has long been aware of the defect described herein.  Yet, KMA has routinely refused to repair the Class Vehicles without charge when the defect manifests. Indeed, in many cases KMA has even refused to disclose the existence of the defect when Class Vehicles displaying symptoms consistent with the defect were brought in for service, instead choosing to ignore the defect until it has caused significant mechanical problems necessitating costly repairs.

6.      Many other owners and lessees of the Class Vehicles have communicated with Defendant KMA and/or its agents to request that they remedy and/or address the defect and/or resultant damage at no expense.  Defendant KMA has routinely failed to do so even within the warranty period.

7.      KMA has also refused to take any action to correct this concealed defect when it manifests in the Class Vehicles outside of the warranty period.  Because the defect can manifest shortly outside of the warranty period for the Class Vehicles – and given KMA's knowledge of this concealed, safety related defect – Defendant KMA's attempt to limit the warranty with respect to the engine defect is unconscionable and unenforceable here.

8.      Despite notice and knowledge of the defect from the numerous complaints it has received, information received from dealers, National Highway Traffic Safety Administration ("NHTSA") complaints, and its own internal records, including durability testing, KMA has not recalled the Class Vehicles to repair the engine defect, offered its

CLASS ACTION COMPLAINT

1    customers suitable repairs or replacements free of charge, or offered to reimburse its
2    customers who have incurred out-of-pocket expenses to repair the defect.

3        9.    As a result of Defendant KMA's unfair, deceptive and/or fraudulent business
4    practices, owners and/or lessees of the Class Vehicles, including Plaintiffs, have suffered
5    an ascertainable loss of money and/or property and/or loss in value.  The unfair and
6    deceptive trade practices committed by Defendant KMA were conducted in a manner
7    giving rise to substantial aggravating circumstances.

8        10.    Had Plaintiffs and other Class Members known of the defect at the time of
9    purchase or lease, they would not have bought or leased the Class Vehicles, or would
10   have paid substantially less for them.

11       11.    Plaintiffs are also informed and believe, and on that basis allege, that as the
12   number of complaints increased, and Class Members grew dissatisfied with the
13   performance of the Class Vehicles, Defendant KMA was forced to acknowledge that the
14   Class Vehicles suffer from an inherent defect.

15       12.    As a result of the defect and the monetary costs associated with attempting
16   to repair the defect, Plaintiffs and the Class Members have suffered injury in fact,
17   incurred damages, and have otherwise been harmed by Defendant's conduct.

18       13.    Accordingly, Plaintiffs bring this action to redress KMA's violations of
19   California and Illinois' consumer fraud statutes, and also seeks recovery for Defendant's
20   breach of express warranty, breach of implied warranty, breach of the duty of good faith
21   and fair dealing, and common law fraud.

## JURISDICTION

23       14.    This Court has subject matter jurisdiction of this action pursuant to 28
24   U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more
25   class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000,
26   exclusive of interest and costs, and (iii) there is minimal diversity because at least one
27   plaintiff and one defendant are citizens of different States.  This Court also has subject
28   matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs

CLASS ACTION COMPLAINT

present a claim under the federal Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*.  This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

15.     This Court has personal jurisdiction over Defendant because it has conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within the districts of California and throughout the United States.

## VENUE

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendant KMA's headquarters is located within this district, it transacts business in this district, it is subject to personal jurisdiction in this district, and therefore is deemed to be a citizen of this district.  Additionally, there are one or more authorized Kia dealers within this district and Defendant KMA has advertised in this district and has received substantial revenue and profits from their sales and/or leasing of Class Vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

## PARTIES

**A.    Plaintiff Greg Wallis**

17.     Plaintiff Greg Wallis ("Plaintiff Wallis") is a citizen of the State of California, and currently resides in La Quinta, California.

18.     In or about November 2013, Plaintiff Wallis purchased a pre-owned 2013 Kia Optima LX (VIN: 5XXGM4A72DG141288) from Glendale Nissan, located in Glendale, California.

19.     Upon information and belief, Plaintiff Wallis's 2013 Kia Optima was assembled at Kia's manufacturing facility, located in Georgia, on or about October 18, 2012.  His vehicle contained a 2.4L GDI engine, manufactured by Hyundai Motor Manufacturing Alabama in Montgomery, Alabama.

CLASS ACTION COMPLAINT

20.     In or about March 2016, while driving on the highway, Plaintiff Wallis began to hear an unusual engine noise upon acceleration.  He then brought his vehicle to Palm Springs Kia, an authorized Kia dealership located in Cathedral City, California.

21.     On or about March 29, 2016, Palm Springs Kia evaluated Plaintiff Wallis's vehicle and a service technician noted the following: "CUSTOMER ADVISED NEEDS TO REPLACE THE MOTOR."  An employee of Palms Springs Kia informed Plaintiff Wallis that they had found metal shavings inside the vehicle's engine, the engine would need to be replaced and a refurbished engine would cost approximately $7,000.00.  Palm Springs Kia charged Plaintiff Wallis $200.00 for the diagnosis on this date.  Plaintiff Wallis declined additional work on his vehicle.

22.     After leaving Palm Springs Kia, Plaintiff began driving to his home in La Quinta, California, located approximately 15 miles from the Kia dealership.  Suddenly, and without warning, the engine in Plaintiff's vehicle seized while driving.  Plaintiff was forced to have his vehicle towed to his home where his vehicle remains inoperable due to the failed engine.

23.     After the engine failure, Plaintiff Wallis contacted KMA Customer Service and explained his situation to the representative.  KMA was unwilling to assist Plaintiff Wallis with the cost of repairing the failed engine in his vehicle.

24.     At all times relevant herein, Plaintiff Wallis adhered to Kia's recommended maintenance intervals.

25.     Plaintiff has suffered an ascertainable loss as a result of Defendant's omissions and/or misrepresentations associated with the engine defect, including, but not limited to, out of pocket losses associated with the engine defect, diminished value of his vehicle, and other consequential damages.

26.     Neither Defendant, nor any of their agents, dealers, or other representatives informed Plaintiff of the existence of the defect prior to, or any time after, his purchase.

//

//

CLASS ACTION COMPLAINT

**B.**   **Plaintiff Jodie Peltier**

27.   Plaintiff Jodie Peltier ("Plaintiff Peltier") is a citizen of the State of Illinois, and currently resides in Round Lake Beach, Illinois.

28.   On or about December 1, 2012, Plaintiff Peltier purchased a new 2013 Kia Sorento (VIN: 5XYKT3A60DG400158) from Raymond Kia, an authorized Kia dealership located in Antioch, Illinois.

29.   Upon information and belief, Plaintiff Peltier's 2013 Kia Sorento was assembled at Kia's manufacturing facility, located in Georgia, on or about January 11, 2012.  Her vehicle contained a 2.4L GDI engine, manufactured by Hyundai Motor Manufacturing Alabama in Montgomery, Alabama.

30.   On or about December 21, 2014, Plaintiff Peltier and her family, consisting of her husband and two children, were using the vehicle for a family road trip, beginning at their home in Round Lake Beach, Illinois, and ending in Orlando, Florida.  Plaintiff Peltier and her family mainly utilized highways for the drive to Florida.

31.   While operating the vehicle on Highway 95 in Jacksonville, Florida, at a speed of approximately 70 miles per hour, Plaintiff Peltier's vehicle abruptly shut off without any prior warning.  Fortunately, Plaintiff Peltier and her family were able to coast the vehicle to the shoulder of the highway without being struck by other vehicles.

32.   Plaintiff Peltier and her family waited on the shoulder of Highway 95 and tried to restart the vehicle.  After approximately ten minutes and several attempts, the vehicle started.  Plaintiff Peltier and her family were able to exit the highway and pull into a nearby service station.  By that time, the vehicle was making a loud ticking and banging sound from the engine compartment.  Plaintiff Peltier felt the vehicle was unsafe to operate any further and called for roadside assistance.  Plaintiff's vehicle was towed to Southside Kia ("Southside Kia") in Jacksonville, Florida.

33.   Since it was a Sunday evening, Plaintiff Peltier and her family were forced to rent a vehicle and make hotel arrangements until Southside Kia opened on Monday morning.

-6-

CLASS ACTION COMPLAINT

34.     On or about December 22, 2014, Southside Kia evaluated Plaintiff Peltier's vehicle, with approximately 29,503 miles on the odometer, and a service technician noted the following: "CHECK ENGINE, ENGINE HAS KNOCKING FROM LOWER END, CONTACT [KIA] TECH LINE, RECOMMEND REPLACEMENT OF ENGINE."

35.     An employee of Southside Kia informed Plaintiff Peltier that her engine had failed and her vehicle required a replacement engine.  Unfortunately, a replacement engine was not currently available at Southside Kia and would likely not be available until the following week.  Plaintiff Peltier and her family were scheduled to be back in Illinois the following week so time was of the essence.  As a result, Plaintiff Peltier reluctantly traded her vehicle, containing a failed engine, at Southwest Kia for a new Kia vehicle.

36.     At all times relevant herein, Plaintiff Peltier adhered to Kia's recommended maintenance intervals.

37.     Plaintiff has suffered an ascertainable loss as a result of Defendant's omissions and/or misrepresentations associated with the engine defect, including, but not limited to, out of pocket losses associated with the engine defect, diminished value of her vehicle, car rental expenses and other consequential damages.

38.     Neither Defendant, nor any of their agents, dealers, or other representatives informed Plaintiff of the existence of the defect prior to, or any time after, her purchase.

**C.     Defendant KMA**

39.     Defendant KMA is an automobile design, manufacturing, distribution, and/or service corporation doing business within the United States.  Furthermore, Defendant KMA designs, develops, manufactures, distributes, markets, sells, leases, warrants, services, and repairs passenger vehicles, including the Class Vehicles.

40.     Defendant KMA is incorporated and headquartered in the state of California with its principal place of business at 111 Peters Canyon Road, Irvine, California 92606. KMA is the U.S. sales and marketing division, which oversees sales and other operations across the United States.  KMA distributes Kia vehicles and sells these vehicles through

-7-

its network of more than 700 dealerships.  Money received from the purchase of a Kia vehicle from a dealership flows from the dealer to KMA.

41.   Upon information and belief, the distribution, service, repair, installation and decisions regarding the GDI Engine as it relates to the engine defect within the Class Vehicles were performed exclusively by Defendant KMA.

42.   Upon information and belief, Defendant KMA developed the post-purchase owner's manuals, warranty booklets and information included in maintenance recommendations and/or schedules for the Class Vehicles.

43.   KMA engages in continuous and substantial business in California.

44.   The true names and capacities of the defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such defendants by such fictitious names.  Each of the defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein.  Plaintiffs will seek leave of Court to amend this Complaint to reflect the true names and capacities of the defendants designated herein as DOES when such identities become known.

45.   Based upon information and belief, Plaintiffs alleges that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each of the other Defendants.  In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendants.

## CALIFORNIA LAW APPLIES

46.   It is appropriate to apply California law to the nationwide claims because California's interest in this litigation exceeds that of any other state.

47.   As discussed above, Defendant KMA is located in Irvine, California, and is the sole entity in the contiguous 48 U.S. states responsible for distributing, selling, leasing and warranting Kia vehicles.

48.     KMA's customer relations, engineering, marketing, and warranty departments are all located in KMA's Irvine campus.  KMA's customer service complaint address is Kia Motors America Consumer Affairs Department, P.O. Box 52410, Irvine, California 92619-2410.  KMA's customer relations department is responsible for fielding customer complaints and monitoring customer complaints posted to Kia or third-party websites.  KMA's warranty and engineering departments are both responsible for the decisions to conceal the engine defect from KMA's customers, and for instituting a policy to systematically deny warranty coverage to those who experienced engine failure caused by the defect.

49.     Based on the foregoing, such policies, practices, acts and omissions giving rise to this action were developed in, and emanated from, Defendant's headquarters in Irvine, California.  As detailed below, KMA also came to know, or should have come to know, of the engine defect through the activities of KMA divisions and affiliated entities located within California.  Accordingly, the state of California has the most significant relationship to this litigation and its law should govern.

## **TOLLING OF STATUTES OF LIMITATIONS**

50.     Any applicable statute(s) of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein.  Plaintiffs and the members of the Class could not have reasonably discovered the true, latent nature of the engine defect until shortly before this class action litigation was commenced.

51.     In addition, even after Plaintiffs and Class Members contacted KMA and/or its authorized dealers for vehicle repairs concerning the engine defect, they were routinely told by Defendant and/or through its dealers that the Class Vehicles were not defective.  As described below, the true cause of the premature and catastrophic failure in the Class Vehicles is a defect that results in restricted oil flow.

52.     Defendant KMA was and remains under a continuing duty to disclose to Plaintiffs and the Members of the Class the true character, quality and nature of the Class Vehicles, that the manufacturing defect will result in restricted oil flow and catastrophic

-9-

engine failure, that they will require costly repairs, pose safety concerns, and diminish the resale value of the Class Vehicles.  As a result of the active concealment by Defendant KMA, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FACTUAL ALLEGATIONS

**A.     The Defective Engine Components within the Class Vehicles**

53.     Kia Motors Corporation ("KMC"), one of the leading motor vehicle manufacturers in Korea, was established in December 1944 under the laws of the Republic of Korea to manufacture and sell a range of passenger cars, recreational vehicles and other commercial vehicles in the domestic and international markets.  As of December 31, 2014, Kia Motors Corporation's largest shareholder is Hyundai Motor Company, which holds 33.88 percent of KMC's stock.[2]  Hyundai Motor Company ("HMC") is a multinational corporation with over 75,000 employees worldwide.  HMC is currently the fourth largest automobile manufacturer in the world.

54.     KMA is the American sales, marketing, and distribution arm of KMC. KMA offers a complete line of vehicles through more than 755 dealers throughout the United States.

55.     In May 2005, HMC opened a $1.1 billion plant in Alabama, the company's first North American manufacturing facility, Hyundai Motor Manufacturing Alabama ("HMMA"), which it also claims to be the most technologically advanced.[3]  The 2-million square-foot manufacturing plant resides on 1,744 acres of land and includes a

_____

[2] http://www.kia.com/worldwide/about_kia/investor_relations/annual_report.do (2014 Annual Report, pg. 69) (last visited June 1, 2016); http://worldwide.hyundai.com/wcm/idc/groups/sggeneralcontent/@hmc/documents/sitecontent/mdaw/mdg1/~edisp/hw085130.pdf (pg. 103) (last visited June 1, 2016).

[3] http://www.hmmausa.com/our-company/about-hmma/hmc-fact-sheet/ (last visited Feb. 22, 2016).

CLASS ACTION COMPLAINT

stamping facility, paint shop, vehicle assembly shop, a two-mile test track and two engine shops.[4]

56.    In or around April 2007, HMMA announced that it would construct a second engine shop at the facility.  The $270 million project would consist of a 349,440 square-foot building to manufacture the 2.4 liter 4-cylinder Theta engines.  This new facility enabled "Hyundai to serve its growing manufacturing operations in the United States, including supplying engines to the new Kia plant being built in Southwest Georgia."[5]

57.    According to its website, HMMA builds its own Theta 2.4 liter 4-cylinder Gasoline Direct Injection and Theta 2.0 liter 4-cylinder Turbo engines.  As a result, "[c]astings of engine blocks, heads and crankshafts are delivered from suppliers and machined to HMMA's exact specifications."[6]

58.    Upon information and belief, certain GDI Engines, which KMC and Defendant KMA used in the Class Vehicles, were manufactured by HMMA at its manufacturing plant in Montgomery, Alabama.

**1.    The GDI Engines**

59.    The Theta 2.0 liter and 2.4 liter engines contained in the Class Vehicles contain a gasoline direct-injection ("GDI") fuel delivery system.  Kia advertises that "[i]t's the Gasoline Direct Injection engine that helps a Kia deliver outstanding performance—in both power and fuel use.  GDI injects highly-pressurized fuel directly into the cylinders during the engine's combustion cycle.  The result is an increased quality of combustion and efficiency.  By making smarter use of fuel, GDI also reduces emissions.  What the driver experiences is still the most critical element of any powertrain technology.  And with GDI, the driver enjoys smooth, powerful acceleration and a longer time between refueling."

---

[4] http://www.hmmausa.com/our-company/about-hmma/ (last visited Feb. 22, 2016)
[5] http://www.hmmausa.com/wp-content/uploads/2011/01/In_4-13-07_low-res_revised1.pdf (last visited on Feb. 22, 2016).

CLASS ACTION COMPLAINT

60.    Hyundai has also made similar public statements regarding the design of the GDI engine: "[t]his shorter, more direct path of fuel delivery, allows for greater control of the fuel mixture at the optimum moment, thus improving efficiency.  The fuel is injected by a camshaft-driven, high pressure pump that operates at pressures up to 2,175 psi.  Direct injection also utilizes a higher than normal 11.3:1 compression ratio for increased power.  The pistons are 'dished' to increase combustion efficiency in the cylinder.  This powerplant delivers best-in-class fuel economy, best-in-class four-cylinder horsepower and best-in-class torque."

61.    As background, the GDI Engines contained in the Class Vehicles use four reciprocating pistons to convert pressure into a rotating motion.  Gasoline is mixed with air in the combustion chambers of the engine.  To generate such rotating motion, a four-step sequence is used (the "Combustion Cycle").  First, the intake stroke begins with the inlet valve opening and a vaporized fuel mixture is pulled into the combustion chamber.  Second, the compression stroke begins with the inlet valve closing and the piston beginning its movement upward, compressing the fuel mixture in the combustion chamber.  Third, the power stroke begins when the spark plug ignites the fuel mixture, expanding the gases and generating power that is transmitted to the crankshaft.  And fourth, the exhaust stroke begins with the exhaust valve opening and the piston moving back up, forcing the exhaust gases out of the cylinder.  The exhaust valve then closes, the inlet valve opens, and the Combustion Cycle repeats itself.   A diagram of Combustion Cycle is below:

//

//

//

//

//

---

[6] http://www.hmmausa.com/hmma-map-page/engines (last visited Feb. 22, 2016).

CLASS ACTION COMPLAINT



62.     The pistons are connected to the crankshaft via the connecting rod.  As the connecting rod moves up and down during the Combustion Cycle, this causes the crankshaft to rotate, ultimately resulting in power to the drive wheels of the vehicle. During this cycle, the crankshaft rotates many thousands of times per minute within each connecting rod.  In order to reduce friction and prolong longevity, this design utilizes a bearing placed between the connecting rod and crankshaft surfaces.  As a result, the connecting rod bearings allow the crankshaft to rotate within the connecting rods during the Combustion Cycle.  An exemplar diagram of the piston, connecting rod, connecting rod bearing and crankshaft are shown below:

//

//

//

//

//

//

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





Figure 3-70.—Connecting rod bearings.

-14-

63.     When the Class Vehicles are in operation, engine oil is used to lubricate the piston, cylinder wall, connecting rod bearings and other rotating and moving components as the piston moves up and down through the four-stroke sequence. Engine oil is necessary to reduce wear on moving parts throughout the engine, improve sealing, and cool the engine by carrying away heat from the moving parts.  Engine oil also cleans and transports contaminants away from the engine to the engine oil filter. Oil is pumped and pressurized throughout the engine by the oil pump.  The oil pump draws oil from the oil pan, located underneath the piston and crankshaft.  The oil pump forces engine oil through the oil filter and then through passages in the engine to properly lubricate and reduce friction in internal moving engine components.  The oil then returns to the oil pan through small drainage holes located throughout the engine where it will be recirculated by the oil pump.  Below is a diagram illustrating the typical path and channels of engine oil lubrication in an overhead cam engine:



64.     The connecting rod bearings are also lubricated with engine oil in order to allow the crankshaft to rotate within the connecting rods.  A close up picture of a functional connecting rod bearing is below:

CLASS ACTION COMPLAINT



### 2.    The Hyundai GDI Recall

65.    On or about September 20, 2015, Hyundai Motor America recalled certain model year 2011-2012 Sonata vehicles manufactured at Hyundai Motor Manufacturing Alabama and equipped with the 2.4L and 2.0T GDI Engines. *See* Exhibit 1.

66.    According to the Hyundai GDI Recall, Hyundai determined that metal debris may have been generated from factory machining operations as part of the manufacturing of the engine crankshaft during December 11, 2009, to April 12, 2012. As a result, and according to the Hyundai GDI Recall:

> [i]f the debris is not completely removed from the crankshaft's oil passages, it can be forced into the connecting rod oiling passages restricting oil flow to the bearings.  Since bearings are cooled by oil flow between the bearing and journal, a reduction in the flow of oil may raise bearing temperatures increasing the potential of premature bearing wear.  A worn connecting rod bearing will produce a metallic, cyclic knocking noise from the engine which increases in frequency as the engine rpm increases.  A worn connecting rod bearing may also result in illumination of the oil pressure lamp in the instrument cluster.

-16-

If the vehicle continues to be driven with a worn connecting rod bearing, the bearing can fail, and the vehicle could stall while in motion.

67.     Hyundai went on the explain, in Safety Recall Report 15V-568, that it became aware of engine-related warranty claims in the field.  Furthermore, "[t]he vast majority of those claims evidenced that customers were responding to substantial noise, or the vehicle's check engine light, and bringing their vehicles to service as a result of those warnings.  Many customers also complained after the warranty was no longer available."

68.     In June 2015, NHTSA raised the issue with Hyundai and Hyundai responded that it did not consider the issue to be safety-related.  Upon reviewing Hyundai's information, the Office of Defects Investigation informed Hyundai of its concern over the potential for higher speed stalling events.  In or around September 2, 2015, Hyundai decided to issue a safety recall for approximately 470,000 model year 2011-2012 Sonata vehicles manufactured December 11, 2009, to April 12, 2012, at Hyundai Motor Manufacturing Alabama and equipped with either a 2.0 liter or 2.4 liter Gasoline Direct Injection engine. *See* Exhibit 2.

69.     The recall provided notification to owners of the issue, inspection and replacement of the engine assembly, as necessary, free of charge.  Additionally, Hyundai increased the warranty for the engine sub-assembly (short block) to 10 years/120,000 miles for both original and subsequent owners.

### 3.     Engine Failures Within the Class Vehicles

70.     Upon information and belief, the connecting rod bearings in the GDI Engines undergo a prolonged failure as metal debris circulates throughout the engine via the engine oil.  Over time, and as a result of these contaminates in the oiling system, the connecting rod bearings begin to fracture.  Once the connecting rod bearings fracture, large amounts of metal debris begin to accumulate in the engine oil.  As a result, the oil becomes so contaminated with metal debris that the oil filter can no longer remove the plethora of contaminates and maintain the necessary oil pressure

-17-

within the engine.  This contaminated engine oil is recirculated throughout the engine by the oil pump, causing damage to the various engine components and eventually results in sudden and unexpected catastrophic engine failure.  If the vehicle is being operated on the highway at the time of the engine failure, it will ultimately result in a high speed stalling event, as it did for Plaintiff Peltier.

71.    Additionally, as the connecting rod bearings continue to fracture, the acceptable tolerances between the bearings, the connecting rod, and the crankshaft rapidly deteriorate.  Eventually, the Class Vehicles begin producing a "knocking" sound originating from the engine as a result of the deteriorating bearings.  In some instances, the defective connecting rod bearings may eventually cause the piston to break through the engine block as a result of the deterioration.

72.    A photograph of a fractured connecting rod bearing removed from a GDI Engine is included below.  As shown in the photograph, the bearing has fractured and worn away to the point of laying flush along the inside of the connecting rod.  A large fracture is also plainly visible along the bottom left side of the bearing.



73.    After the connecting rod bearings fail and metal debris is circulated throughout the engine via the engine oil, damage is caused to other key engine components.  As pictured below, the main cap – which fastens the crankshaft to the

1   engine – can also be damaged by the metal debris in the engine oil.  After the main cap

2   is damaged, play between the main cap and engine develops, which also leads to

3   catastrophic engine failure.



14      74.     As a result of the defect, the Class Vehicles suffer from restricted and

15   inadequate engine oil lubrication.  As explained above, engines are designed to have oil

16   distributed throughout the engine through lubrication channels.  When operating

17   properly, the engine oil is distributed throughout the engine by the oil pump and then

18   flows back to the oil pan where it is redistributed throughout the engine.

19      75.     In the Class Vehicles, the lubrication channels become clogged and

20   restricted due to the defect even under normal use and proper maintenance.  When the

21   lubrication channels clog, engine oil is unable to be both pumped throughout the engine

22   (through the oil pump) and is also unable to adequately return to the oil pan, causing a

23   condition known as oil starvation.  This results in insufficient lubrication throughout the

24   Class Vehicles' engine, which causes premature wear of the engine components and

25   catastrophic engine failure.

26      76.     The engine defect poses serious safety and security issues for operators and

27   occupants of the Class Vehicles.  By way of example, the California Department of

28   Motor Vehicles asserts that stalled engines pose a significant safety risk and, as part of its

CLASS ACTION COMPLAINT

safety curriculum, instructs how to properly respond to a stalled action in order to avoid further risk of injury.

77. NHTSA takes a similar view of engine failure during vehicle operation. For instance, according to *Forbes*, in 2011 the NHTSA recalled certain Chrysler and Dodge vehicles due to "engine seizure because of connecting rod bearing failure . . . . Engine seizure could increase the risk of a crash."[7]

78. Defendant KMA failed to adequately research, design, test and/or manufacture the Class Vehicles before warranting, advertising, promoting, marketing, and selling the Class Vehicles as suitable and safe for use in an intended and/or reasonably foreseeable manner.

## B.  Defendant KMA's Knowledge of the Engine Defect

79. Plaintiffs' experiences are by no means isolated or outlying occurrences. Indeed, the internet is replete with examples of blogs and other websites where consumers have complained of the exact same engine defect within the Class Vehicles. Upon information and belief, Defendant KMA, through (1) their own records of customers' complaints, (2) dealership repair records, (3) records from the National Highway Traffic Safety Administration ("NHTSA"), (4) warranty and post-warranty claims, (5) internal durability testing, and (6) other various sources, were well aware of the engine defect but failed to notify consumers of the nature and extent of the problems with the GDI Engines or provide any adequate remedy.

80. KMA routinely monitors the internet for complaints similar in substance to those quoted below. KMA's customer relations department routinely monitors the internet for customer complaints, and KMA has retained the services of third-parties to do the same. Further, the customer relations division regularly receives and responds to customer calls concerning, *inter alia*, product defects. Through these sources, KMA was

---

[7] http://www.forbes.com/sites/altheachang/2011/09/30/engine-problems-prompt-chrysler-recalls/ (last visited June 1, 2016).

CLASS ACTION COMPLAINT

made aware of the engine defect.  The complaints also indicate KMA's knowledge of the defect and its potential danger.

81.    KMA is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, KMA likely conducts testing on incoming batches of components, including the GDI Engine, to verify that the parts are free from defects and comply with KMA's specifications.  Accordingly, KMA knew or should have known that the engine used in the Class Vehicles is defective and likely to fail prematurely, costing Plaintiffs and Class Members thousands of dollars in expenses.

82.    Moreover, KMA also should have known of the connecting rod bearing defect and insufficient lubrication channels because of the sheer number of reports of engine problems relating to the connecting rod bearings and/or lubrication channels.  For instance, KMA's customer relations department, which interacts with Kia-authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues, has received numerous reports of engine problems relating to the connecting rod bearings and lubrication channels.  Customer relations also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

83.    KMA's warranty department similarly reviews and analyzes warranty data submitted by its dealerships and authorized technicians in order to identify defect trends in its vehicles.  KMA dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide KMA with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in case KMA later determines to audit the dealership or otherwise verify the warranty repair.  For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to KMA because KMA will not pay

1  the service centers for the repair if the complaint, cause, and correction are not

2  sufficiently described.

3        84.   KMA knew or should have known about the engine defect because of the

4  high number of replacement parts likely ordered from KMA.  All Kia service centers are

5  required to order replacement parts, including engines, piston assemblies and connecting

6  rod bearings directly from KMA.  Other independent vehicle repair shops that service

7  Class Vehicles also order replacement parts directly from KMA.  KMA routinely monitor

8  part sales reports, and are responsible for actually shipping parts requested by dealerships

9  and technicians.  Thus, KMA has detailed, accurate, and real-time data regarding the

10  number and frequency of replacement part orders.  The sudden increase in orders for the

11  GDI Engines and engine components used in the Class Vehicles was known to KMA,

12  and should have alerted it to the scope and severity of the engine defect.

13        85.   In February 2012, KMA issued a technical service bulletin ("TSB") to its

14  authorized dealerships regarding an engine knocking noise.  TSBs are documents used by

15  automotive manufacturers to inform dealership technicians about new information,

16  including vehicle problems, new repair procedures, and improved parts.  In TSB No.

17  ENG114R1, KMA acknowledged that the Class Vehicles are defective and experience a

18  "knocking noise."  As a result, KMA directed dealers to blame the engine defect on the

19  use of aftermarket oil filters and instructed the dealers to replace the aftermarket oil filter

20  with a genuine Kia oil filter.  The TSB also explained that this "repair" is not covered

21  under warranty.  KMA has failed to provide any post-sale notification to owners and

22  lessees regarding the use of only genuine Kia oil filters in the Class Vehicles.  Instead,

23  KMA attempts to circumvent warranty obligations related to the engine defect by faulting

24  customers for use of an aftermarket oil filter.  The defective connecting rod bearings and

25  oil lubrication channels are not, however, caused by the use of an aftermarket engine oil

26  filter.  Despite KMA's knowledge of this fact, KMA has not informed Plaintiffs of the

27  true cause of the defective connecting rod bearings and insufficient oil lubrication

28  channels.

CLASS ACTION COMPLAINT

### 1. <u>Complaints by Other Class Members</u>

86. Representative examples of complaints on the NHTSA website regarding the Class Vehicles are included below (with emphasis supplied in capitalized bold, underlined letters)[8]:

### *a. KIA GDI Engine Complaints*

Vehicle: 2011 Kia Optima
Date Complaint Filed: 10/16/2014
Component(s): ENGINE
Date of Incident: 10/12/2014
NHTSA ID Number: 10645013
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): KNAGN4A61B5 . . .

**SUMMARY:**
TL\* THE CONTACT OWNS A 2011 KIA OPTIMA. THE CONTACT STATED THAT **WHILE DRIVING 75 MPH AT NIGHT WITH THE CRUISE CONTROL ACTIVATED, THERE WAS SMOKE COMING FROM UNDER THE HOOD AND THE VEHICLE ENGULFED INTO FLAMES.** THE FIRE DEPARTMENT EXTINGUISHED THE FIRE. A POLICE/FIRE REPORT WAS FILED AND THERE WERE NO INJURIES REPORTED. THE VEHICLE WAS DESTROYED AND THE CAUSE OF THE FIRE WAS NOT DETERMINED. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 51,500.

Vehicle: 2011 Kia Optima
Date Complaint Filed: 04/16/2015
Date of Incident: 03/31/2015
Component(s): ELECTRICAL SYSTEM. ENGINE
NHTSA ID Number: 10706020
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): KNAGN4A72B5 . . .

**SUMMARY:**
TL\* THE CONTACT OWNS A 2011 KIA OPTIMA. **WHILE TRAVELING AT APPROXIMATELY 50 MPH AND ATTEMPTING TO SLOW DOWN FOR A STOP LIGHT, THE VEHICLE STALLED WITHOUT WARNING AND FAILED TO RESTART.** THE VEHICLE WAS TOWED TO AN AUTHORIZED DEALER WHO DIAGNOSED THAT THE STARTER BURNED OUT AND THAT THE ENGINE SEIZED. THE DEALER REPLACED THE STARTER AND WAS NOT ABLE TO DIAGNOSE THE SOURCE OF THE FAILURE. THE CONTACT WAS INFORMED THAT A MORE EXTENSIVE DIAGNOSIS WAS REQUIRED AND THE ENGINE NEEDED TO BE TAKEN APART. THE ENGINE FAILURE WAS NOT REPAIRED BY THE DEALER. THE VEHICLE WAS NOT ABLE TO BE DRIVEN. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE

---

[8] The foregoing complaints are reproduced as they appear on the NHTSA website. Any typographical errors are attributable to the original author of the complaint.

CLASS ACTION COMPLAINT

FAILURE MILEAGE WAS NOT AVAILABLE.

Vehicle: 2011 Kia Optima
Date Complaint Filed: 05/29/2015
Date of Incident: 05/27/2015
Component(s): ENGINE. SERVICE BRAKES
NHTSA ID Number: 10722186
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): KNAGM4A7XB5 . . .

**SUMMARY:**
I HAVE A 2011 KIA OPTIMA LX. 2.4 LITER ENGINE. ALWAYS KEEP UP ON THE MAINTENANCE AND OIL CHANGES. CAR IS IN GREAT SHAPE. I WAS NOT EXPERIENCING ANY ISSUES. WARNINGS. NO CHECK ENGINE/OIL LIGHTS. NO NOISES. ABSOLUTELY NOTHING. **THEN LAST NIGHT MY CAR JUST SPUTTERED AND CUT OFF WHILE BEING DRIVEN. APPARENTLY WHEN THE ENGINE CUTS OFF. SO DOES THE BRAKES. THERE WAS NO WAY TO PUSH THE BRAKES. SO I HAD TO TRY TO SAFELY COAST TO THE SIDE OF THE ROAD. WITH NO BRAKES AND NO POWER STEERING.** I FINALLY PULLED OVER. TRIED TO RESTART THE CAR AND THERE WAS SUCH A LOUD KNOCKING NOISE. AND SOME SQUEALING NOISES AS WELL. THE CAR WILL NO LONGER START EITHER. I HAD A MECHANIC LOOK AT IT TODAY AND SAYS THE ENGINE IS "JUST GONE." NO EXPLANATIONS AT ALL. I VERIFIED THAT THE KIA OPTIMA AND THE HYUNDAI SONATA ARE THE SAME MANUFACTURER AND USE THE SAME ENGINES. I SEE THERE ARE WAY MORE COMPLAINTS ABOUT THE 2011 HYUNDAI SONATA WITH THIS SAME ISSUE. I WILL TRY TO NOTIFY KIA AND SEE IF THEY ARE WILLING TO STEP UP AND CORRECT THIS EVEN WITH THE WARRANTY EXPIRING 7.000 MILES AGO. SINCE I AM THE SECOND OWNER. I HAVE FOUND MANY COMPLAINTS ABOUT THIS SAME THING FOR BOTH THE 2011 OPTIMAS AND SONATAS. THIS IS SO DANGEROUS BECAUSE THERE ARE NO WARNINGS. AND THE ENGINE CUTS OFF IN TRAFFIC. WHICH ALSO CAUSES THE BRAKES AND STEERING TO GO OUT. NOT SAFE AT ALL.

Vehicle: 2011 Kia Optima
Date Complaint Filed: 08/24/2015
Date of Incident: 08/24/2013
Component(s): ENGINE
NHTSA ID Number: 10778079
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): KNAGM4A7XB5 . . .

**SUMMARY:**
DRIVING DOWN EXPRESS WHEN ENGINE STARTED TO LOOSE OIL. PULLED OVER ON SHOULDER. NOTICE A CLICKING NOISE AND SMELLED BURNING OIL. DEALER FOUND HOLE IN SIDE OF ENGINE BLOCK. STATED NEEDS NEW ENGINE AND QUOTED AN ESTIMATED PRICE OF $5.875.64 FOR A USED ENGINE WITH 46.000 MILES INSTALLED. HAD CAR REPAIRED AT ANOTHER PLACE FOR $5477.06 WITH 41.000 MILES. THIS SHOP SAID THE ENGINE HAD A ROD KNOCK THEN LOCKED UP. NEEDS THE ENGINE REPLACED. **THIS IS THE SAME 2.4 LITER ENGINE THAT IS BEING RECALLED FOR THE HYUNDAI SONATAS.**

-24-

Vehicle: 2011 Kia Optima
Date Complaint Filed: 09/29/2015
Date of Incident: 06/21/2015
Component(s): ENGINE
NHTSA ID Number: 10778375
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): KNAGM4A72B5 . . .

**SUMMARY:**
TL* THE CONTACT OWNS A 2011 KIA OPTIMA. **WHILE DRIVING AT APPROXIMATELY 40 MPH. THE CHECK ENGINE WARNING LIGHT ILLUMINATED. THE DRIVER SHUT OFF THE VEHICLE AND IT FAILED TO RESTART.** THE VEHICLE WAS TOWED TO A DEALER WHO DIAGNOSED THAT THE ENGINE NEEDED TO BE REPLACED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS 71.106.

Vehicle: 2011 Kia Optima
Date Complaint Filed: 11/09/2015
Date of Incident: 10/31/2015
Component(s): ELECTRICAL SYSTEM . ENGINE
NHTSA ID Number: 10789435
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): KNAGM4A79B5 . . .

**SUMMARY:**
**WHILE DRIVING 70 MPH ON THE HIGHWAY MY 2011 KIA OPTIMA ENGINE SHUT DOWN AND WOULD NOT ACCELERATE AND THE BRAKES WOULD NOT FUNCTION.** LUCKILY. I SAFELY MADE IT TO THE FAR SHOULDER OF THE HIGHWAY ONLY TO FIND THAT MY CAR WAS SMOKING AND SMELLED LIKE SOMETHING WAS BURNING. HAD TO GET THE CAR TOWED TO THE DEALERSHIP AND THEY INFORMED THE ENGINE NEEDS TO BE REPLACED AND THE STARTER IS ALSO FRIED. I HAVE SEEN FOUR COMPLAINTS SO FAR OF 2011 KIA OPTIMA'S WITH THE SAME ISSUE AND AM SURE I WILL FIND MORE. THAT SEEMS LIKE TOO MUCH OF A COINCIDENCE THAT IT HAPPENS SO FREQUENTLY WITH THESE MODELS AND THERE ISN'T ANY SORT OF RECALL. NO BREAKS AT 70 MPH IS PRETTY DANGEROUS. I HAVE CONTACTED MY ATTORNEY AND HOPE THIS MANUFACTURER WILL DO THE RIGHT THING.

Vehicle: 2011 Kia Optima
Date Complaint Filed: 12/13/2015
Date of Incident: 12/06/2015
Component(s): ENGINE
NHTSA ID Number: 10809924
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): KNAGM4A75B5 . . .

**SUMMARY:**
WAS DRIVING DOWN THE INTERSTATE AND THE CAR DIED AFTER PULLING OFF TO THE SHOULDER TRIED TO START THE CAR AND ALL IT WOULD DO WAS CLICK. TOWED THE CAR HOME THINKING IT WAS AN ALTERNATOR OR SOMETHING SIMPLE. NEXT MORNING LOOKED AT THEN CHANGED THE BATTERY AND TRIED TO GET IT STARTED IN

-25-

SLIGHTLY TURNED OVER BUT NOT ENOUGH TO START CALLED THE DEALER TO DROP IT OFF AND THEY SAID CAR WAS SEIZED OUT OF WARRANTY AND NEEDS THE ENGINE REPLACED. **AFTER SEARCHING ON THE INTERNET AND LOOKING AT COMPLAINTS FOUND THAT MY ENGINE WAS BUILT AT THE SAME PLANT AS THE HYUNDAI SONATA SAME ENGINE. WHICH IS RECALLED FOR THIS SAME EXACT PROBLEM . I AM WONDERING WHY KIA ACTED LIKE THE CANT BELIEVE THIS WOULD HAPPEN WHEN THESE CARS SHOULD BE RECALLED ALSO** . WHAT CAN BE DONE HERE ? I WILL NOT LET THIS GO IT IS WRONG KIA'S SHOULD BE LOOKED INTO AND RECALLED

Vehicle: 2011 Kia Optima
Date Complaint Filed: 02/29/2016
Date of Incident: 05/09/2015
Component(s): ENGINE
NHTSA ID Number: 10838965
Consumer Location: SAN ANTONIO, TX
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): KNAGM4A76B5 . . .

**SUMMARY:**
TL-THE CONTACT OWNS A 2011 KIA OPTIMA. **THE CONTACT STATED THAT WHILE DRIVING APPROXIMATELY 60 MPH. AN ABNORMAL SOUND EMITTED FROM UNDER THE HOOD OF THE VEHICLE AS THE CHECK ENGINE OIL WARNING LIGHT FLICKERED.** THE VEHICLE WAS TAKEN TO AN INDEPENDENT MECHANIC WHERE IT WAS DIAGNOSED THAT THE CONNECTING ROD FAILED AND THE ENGINE NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 92,000. SS

Vehicle: 2012 Kia Optima
Date Complaint Filed: 09/23/2014
Date of Incident: 09/22/2014
Component(s): ENGINE
NHTSA ID Number: 10638362
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): 5XXGN4A7XCG . . .

**SUMMARY:**
**DRIVING VEHICLE AT 35-40 MPH. ALL OF A SUDDEN ENGINE STOPPED.** THERE WAS HEAVY SMOKE COMING FROM UNDER THE HOOD AND SMELLED OF AN ELECTRICAL FIRE. SMOKE DISSIPATED AFTER 15 MINUTES. VEHICLE WAS UNABLE TO BE RESTARTED AND HAD TO BE TOWED TO KIA DEALERSHIP IN TURNERSVILLE NJ. SPOKE WITH DEALERSHIP ON 9/23 AND WAS TOLD STARTER AND ENGINE NEEDS TO BE REPLACED. *TR

Vehicle: 2012 Kia Optima
Date Complaint Filed: 09/26/2014
Date of Incident: 09/11/2014
Component(s): ENGINE
NHTSA ID Number: 10639417
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): Not Available . . .

CLASS ACTION COMPLAINT

**SUMMARY:**
TL* THE CONTACT OWNS A 2012 KIA OPTIMA. **THE CONTACT STATED THAT WHILE DRIVING AT APPROXIMATELY 70 MPH. THE ENGINE STALLED WITHOUT WARNING.** IN ADDITION. A STRONG ELECTRICAL BURNING ODOR EMITTED INSIDE OF THE VEHICLE. THE VEHICLE WAS TOWED TO A DEALER FOR DIAGNOSIS. THE MECHANIC INFORMED THAT THE STARTER AND ASSOCIATED FUSES WERE COMPLETELY BURNT. THE VEHICLE WAS REPAIRED. THE CONTACT STATED THAT AFTER THE REPAIRS WERE PERFORMED. THE VEHICLE FAILED TO START. THE VEHICLE WAS TAKEN BACK TO THE DEALER WHO RECOMMENDED THE ENGINE NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE VIN WAS UNAVAILABLE. THE APPROXIMATE FAILURE MILEAGE WAS 55,000.

Vehicle: 2012 Kia Optima
Date Complaint Filed: 09/30/2015
Date of Incident: 08/02/2015
Component(s): ENGINE
NHTSA ID Number: 10778891
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): 5XXGN4A76CG . . .

**SUMMARY:**
I WAS DRIVING ON I 95 ON OUR WAY HOME FROM FLORIDA. WE WERE PASSING FAYETTSVILLE .NC WHEN MY CAR ENGINE MADE SOME KNOCKING NOISE AND THEN THE ENGINE LIGHT CAME ON. BEFORE I CAN PULL TO THE SHOULDER. **THE CAR STALLED.LOST POWER AT 70 MLS PER HR. WE WERE LUCKY NO ONE HIT US AS I WAS SLOWLY NAVIGATING TO THE SHOULDER.** I HAD IT TOWED TO A KIA DEALERSHIP IN FAYETTSVILLE.NC. THEY SAID ENGINE SEIZED UP AND NEEDS TO BE REPLACE. THE CAR HAS 71.000MLS BUT KIA DENIED MY WARRANTY CLAIM SO I END UP PAYING $5.700 FOR A REMANUFACTURED ENGINE.

Vehicle: 2012 Kia Optima
Date Complaint Filed: 12/14/2015
Date of Incident: 11/28/2015
Component(s): ENGINE
NHTSA ID Number: 10809989
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): 5XXGR4A69CG . . .

**SUMMARY:**
THE VEHICLE HIT 63.000 MILES DURING THIS INCIDENT. AS I WAS MERGING ONTO THE EXPRESSWAY AT 50MPH. **I GOT THE VEHICLE TO 60MPH AND THE SPEEDOMETER GAUGE FROZE AT 60MPH. THEN. THE RPM GAUGE DROPPED TO 0. SUDDENLY THE ENGINE LOST POWER. THE BRAKES LOCKED UP AND BEFORE I GOT THE CAR OFF TO THE SHOULDER AT A COMPLETE STOP. THE ENGINE CUT OUT COMPLETELY.** THE ENGINE WOULD NOT START AT ALL AFTER IT CUT OUT. I THEN BROUGHT THE VEHICLE TO A DEALERSHIP WHERE THEY DEEMED A NEW ENGINE AS THE CURRENT ENGINE BLEW.

-27-

Vehicle: 2012 Kia Optima
Date Complaint Filed: 01/21/2016
Date of Incident: 01/13/2016
Component(s): ENGINE
NHTSA ID Number: 10821364
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): 5XXGR4A67CG . . .

**SUMMARY:**
**DRIVING AT APPROXIMATELY 50 MPH ON THE PARKWAY. ENGINE STALLED WITHOUT WARNING AND WOULD NOT RE-START.** I HAD THE CAR TOWED TO A SHOP WHERE THEY INFORMED ME THE ENGINE HAD SEIZED. THERE WAS DEFINITELY OIL IN THERE AS I HAD AN OIL CHANGE WITHIN THE LAST COUPLE OF WEEKS.. THE CAR HAS 72K MILES ON IT AND I AM THE SECOND OWNER SO NOT COVERED BY KIA'S NON-TRANSFERABLE 10YR/100K MI WARRANTY. WORKING WITH KIA CUSTOMER SERVICE. WAITING TO HEAR BACK FROM A SUPERVISOR.

Vehicle: 2013 Kia Optima
Date Complaint Filed: 06/14/2013
Date of Incident: 06/12/2013
Component(s): ENGINE
NHTSA ID Number: 10519827
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): 5XXGR4A63DG . . .

**SUMMARY:**
DRIVING ON A CITY ROAD DURING NORMAL TRAFFIC (4:30PM EST) MY VEHICLE BEGAN TO MAKE LARGE RATTLING NOISE FROM THE ENGINE COMPARTMENT. AT FIRST I THOUGHT I HAD PICKED UP SOMTHING ON THE ROAD. BUT AS I ACCELERATED/DECCELERATED THE NOISE BECAME LOUDER/SOFTER. I IMMEDIATLEY CONTACTED MY KIA DEALERSHIP. AFTER SPEAKING TO THE SERVICE MANAGER HE TOLD ME TO BRING THE VEHICLE IN NEXT WEEK SINCE THAT WOULD BE THE SOONEST IT COULD BE LOOKED AT. I INFORMED HIM THAT I DID'NT THINK I COULD EVEN MAKE IT HOME LET ALONE WAIT A WEEK TO BRING THE VEHICLE IN. HE STATED I COULD DROP IT OFF. BUT IT WOULD NOT BE LOOKED AT UNTIL NEXT WEEK. EITHER WAY. WITHIN 10 MIUTES OF DRIVING A LARGE BANGING NOISE WENT OFF UNDER THE HOOD. ENGINE OIL SPRAYED THROUGHT THE ENGINE COMPARTMENT AND I HAD COMPLETE LOSS OF POWER. KIA ROADSIDE ASSISTANCE TOWED THE VEHICLE TO THE DEALERSHIP WHERE THEY HAVE INFORMED ME THAT THE ENGINE NEEDS TO BE REPLACED. THE VEHICLE IS LESS THAN 2 WEEKS OLD AND HAD 600 MILES WHEN THIS OCCURED. I INFORMED THE DEALERSHIP I WOULD NOT WANT A VEHICLE WITH A REPLACED ENGINE AND THEY HAVE INFORMED ME THAT IS MY ONLY OPTION. I WILL NOT BE PURCHASING FROM KIA AGAIN AS THERE WAS NO SUPPORT FROM THEIR CORPORATE CUSTOMER SERVICE EITHER. *TR

Vehicle: 2013 Kia Optima
Date Complaint Filed: 08/17/2015
Date of Incident: 08/12/2015
Component(s): ENGINE

-28-

NHTSA ID Number: 10749310
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): 5XXGN4A72DG . . .

**SUMMARY:**
THE EVENING OF 8/12/15 **I WAS DRIVING DOWN A 4 LANE CITY ROAD. 2 LANES EACH DIRECTION. THE ENGINE COMPLETELY SHUT OFF LEAVING ME WITH NO POWER AND IN A VERY DANGEROUS SITUATION WITH SUDDEN DECELERATION AND VEHICLES COMING UP FROM BEHIND.** FORTUNATELY. NO ONE HIT ME AND I WAS ABLE TO MOVE THE CAR OUT OF TRAFFIC. NO ENGINE MAINTENANCE/WARNING LIGHTS CAME ON PRIOR TO THE ENGINE FAILURE. WE HAVE BEEN INFORMED THE ENGINE IS LOCKED UP AND WILL NEED COMPLETELY REPLACE WITH A NEW ENGINE. ROUTINE MAINTENANCE. INCLUDING KIA'S 22.500 MILE RECOMMENDED MAINTENANCE WAS PERFORMED ONLY 16 DAYS PRIOR ON 7/27/15. DAVE GREEN. KIA ARAPAHOE SERVICE MANAGER. INFORMED TODAY (8/17/15) THAT THEY HAVE SEEN SEVERAL INSTANCES OF THIS IN THE PAST WEEK. THEY BELIEVE THERE IS A CONNECTION TO THE HOT WEATHER. WHAT EVER THE CAUSE THIS HAS A VERY HIGH POTENTIAL TO CAUSE DEATH OR EXTREME INJURY

### b.    Hyundai GDI Engine Complaints

Vehicle: 2011 Hyundai Sonata
Date Complaint Filed: 1/21/2015
Component(s): ENGINE
Date of Incident: 01/19/2015
NHTSA ID Number: 10678152
Manufacturer: Hyundai Motor America
Vehicle Identification No. (VIN): 5NPEC4ACBH0 . . .

**SUMMARY:**
**I WAS DRIVING DOWN THE HIGHWAY, THE ENGINE STARTED MAKING A KNOCKING NOISE.** NO LESS THAN 30 SECONDS LATER DID THE CAR'S ENGINE MAKE A LARGE BAG NOISE AND I RAN OVER WHAT FELT LIKE PARTS. I COASTED A WHILE DOWN THE ROAD AND FINALLY PULLED THE CAR OVER TO THE SIDE OF THE ROAD. UPON OPENING THE HOOD I DISCOVERED OIL ALL OVER THE INTAKE AND EXHAUST MANIFOLDS AS WELL AS THE RADIATOR. I CALLED HYUNDAI ROADSIDE ASSISTANCE AND HAD THE CAR TOWED TO FAULKNER HYUNDAI IN HARRISBURG PA ON 1/19/14. THEY PROVIDED A SERVICE LOANER AND SAID THEY WOULD GET BACK TO ME WITH AN UPDATE ON THE CAR. I WAITED UNTIL WEDNESDAY THE 21ST BEFORE CALLING THEM, ONLY TO FIND OUT THAT THE ENGINE HAD SEIZED AND THEY HAD ALREADY TAKEN PICTURES OF THE DAMAGE AND SENT THEM TO THE HYUNDAI PEOPLE TO SEEK WARRANTEE COVERAGE. THEY ALSO ASKED ME FOR MAINTENANCE RECORDS ON THE CAR. I CHANGE THE OIL MYSELF AND ALWAYS PUT IN FULL SYNTHETIC, SO THEY HAD ME SUBMIT RECEIPTS FROM THE AUTO PARTS STORE PROVING I BOUGHT OIL AND FILTERS OR THE SONATA. I AM NOW AWAITING RESOLUTION FROM HYUNDAI. WILL UPDATE ONCE I HAVE AN ANSWER FROM HYUNDAI. THIS IS A PRETTY SERIOUS SAFETY CONCERN. **THE ENGINE LET GO AT 60+MPH WITHOUT WARNING, WHEN IT LET GO IT BLEW OIL ALL OVER THE ENGINE COMPARTMENT AND I'M SURE ON THE ROAD AS**

-29-

**WELL. LUCKY I WAS DRIVING EARLY IN THE MORNING AND THEIR WAS VERY LITTLE TRAFFIC.**

Vehicle: 2011 Hyundai Sonata
Date Complaint Filed: 1/06/2015
Component(s): ENGINE
Date of Incident: 01/06/2015
NHTSA ID Number: 10670454
Manufacturer: Hyundai Motor America
Vehicle Identification No. (VIN): 5NPEB4AC4 . . .

**SUMMARY:**
**I WAS TRAVELING DOWN A HIGHWAY WHEN MY ENGINE STARTED TO MAKE A KNOCKING SOUND.** THE CHECK ENGINE LIGHT CAME ON, AND WITHIN 10 SECONDS MY CAR STOPPED RUNNING. I WAS STILL MOVING WHEN THIS HAPPENED. I WAS FORTUNATE TO BE ABLE TO COAST TO A CLOSE BY SIDE ROAD. I AM GRAVELY CONCERNED THAT THIS COULD HAVE HAPPENED ON THE INTERSTATE AT HIGHER SPEEDS, AND THE POTENTIAL CONSEQUENCES OF SUCH. **I HAD THE CAR TOWED TO A DEALER, AND THEY TELL ME THE ENGINE IS SHOT.** I CONTACTED HYUNDAI CUSTOMER CARE, AND THEIR RESPONSE WAS "WHAT DO YOU WANT ME TO DO ABOUT IT." AFTER MORE RESEARCH, I HAVE FOUND NUMEROUS OTHER INSTANCES OF THIS ENGINE FAILURE. IF THIS IS AN ONGOING PROBLEM, I FEEL HYUNDAI SHOULD DO SOMETHING BEFORE SOMEONE GETS KILLED WHEN THIS HAPPENS. PLEASE NOTE I AM THE SECOND OWNER OF THIS CAR. THE MILEAGE AT JUST OVER 85,000 IS MAINLY HIGHWAY MILES, AND THE CAR IS SERVICED REGULARLY.

Vehicle: 2011 Hyundai Sonata
Date Complaint Filed: 10/26/2014
Component(s): ENGINE
Date of Incident: 10/01/2014
NHTSA ID Number: 10650011
Manufacturer: Hyundai Motor America
Vehicle Identification No. (VIN): 5NPEB4AC0BH . . .

**SUMMARY:**
10/1/2014 @ 7:30PM EST - **WHILE DRIVING HOME, WAS AT A RED LIGHT WHEN THE CAR STALLED OUT. THEN A LOUD KNOCKING SOUND HAPPENED. *NO LIGHT WAS ON*** IT IS VERY UNSAFE FOR THE ENGINE TO STALL OR JUST RANDOMLY SHUTOFF WHILE IN TRAFFIC. THERE WERE NO SIGNS OR WARNINGS, THE VEHICLE JUST STALLED. VEHICLE WAS NOT SAFE TO OPERATE. I HAD THE VEHICLE TOWED TO NORTHTOWNE HYUNDAI DEALER ON SHERIDAN DRIVE, BUFFALO NY.10/3/2014 @ 2:47PM EST - **NORTHTOWNE HYUNDAI DEALER CALLED ME SAID THAT I NEED TO REPLACE MY ENGINE BECAUSE THE PISTON POPPED.** I SAID WELL, MY CAR IS WELL WITHIN THE WARRANTY, ISN'T THIS COVERED? NORTHTOWNE HYUNDAI DEALER SAID THAT WE CAN'T SUBMIT YOUR WARRANTY CLAIM WITH OUT RECEIPTS OF YOUR MAINTENANCE FROM 5K MILES TO PRESENT. 10/3 - 10/13/2014 - CONTACTED OUR 3 LOCAL PLACES WE LIKE TO SEND OUR VEHICLES TO FOR COPIES OF OUR RECEIPTS. WITH NO PROBLEM WE WERE ABLE TO OBTAIN COPIES OF OUR LAST 7 OIL CHANGES AND

-30-

CLASS ACTION COMPLAINT

GENERAL MAINTENANCE RECEIPTS. 10/14/2014 @ 2:00PM EST - MY HUSBAND GAVE NORTHTOWNE HYUNDAI DEALER OUR RECEIPTS AND HE STATED THAT HE WILL SUBMIT OUR CLAIM TO HYUNDAI. 10/24/2014 @ 8:59AM EST - "REGIONAL" / "CORPORATE" CALLED ME AND STATED "THE DISTRICT MANAGER WHO WOULD HAVE AUTHORIZED THE REPAIR, HAD THE DEALERSHIP PARTIALLY DISASSEMBLE THE ENGINE; TAKE OFF THE COVER FOR INSPECTION, AND THERE'S A CONDITION OF SLUDGE WHICH IS INDICATIVE OF EITHER THE MAINTENANCE INTERVALS NOT BEING FOLLOWED; OIL CHANGE NOT FREQUENTLY ENOUGH OR POSSIBLY THE QUALITY OR GRADE OF THE OIL USED. IN EITHER CASE THESE IS NOT A MANUFACTURE DEFECT, SO HE HAS DENIED WARRANTY COVERAGE." I'VE ALSO ADDED MY COMPLAINT TO THE FOLLOWING:[ HTTP://WWW.CHIMICLES.COM/2011-HYUNDAI-SONATA-ENGINE-FAILURE-CLASS-ACTION-LAWSUIT ] ** **OUR LAST OIL CHANGE WAS 8/2/2014 AT 43K MILES ** WE HAD A CLEAN BILL OF HEALTH, NO ISSUES WERE REPORTED OR MAINTENANCE RECOMMENDED AT THAT TIME**.

Vehicle: 2012 Hyundai Sonata
Date Complaint Filed: 1/02/2015
Component(s): ENGINE
Date of Incident: 12/27/2013
NHTSA ID Number: 10669708
Manufacturer: Hyundai Motor America
Vehicle Identification No. (VIN): 5NPEB4AC0 . . .

**SUMMARY:**
**WAS DRIVING 35 MPH MAKING A TURN WHEN I HEARD A KNOCKING NOISE**. WAS SUBTLE AT FIRST. CHECKED OIL AND WAS LOW. ADDED 1 QRT OF OIL. DROVE HOME ABOUT 2 MILES AND KNOCKING BECAME EXTREMELY LOUD. **TOOK IT TO LEN STOLER HYUNDAI DEALERSHIP AND THEY STATED THAT EXHAUST MANIFOLD, DRIVE BELT, PISTONS, AND VALVES NEED TO BE REPLACED**. BASICALLY, $6300.00 WORTH OF WORK. CAR IS UP TO DATE ON ALL MAINTENANCE. NO OTHER ISSUES WITH CAR. WARRANTY DOES NOT COVER ENGINE DAMAGE AND NO HELP WAS GIVEN. I HAVE SEEN MANY OTHER COMPLAINTS ABOUT THE SAME ENGINE ISSUES. HYUNDAI SHOULD REPLACE!

87.     Upon information and belief, KMA regularly monitors these NHSTA databases as part of its ongoing obligation to identify potential defects in its vehicles. NHTSA complaints establish that KMA knew, or should have known, of the engine defect *at least* as early as June 14, 2013. Upon information and belief, Defendant became aware of the engine defect earlier than June 2013 through: (1) Defendant's own records of customers' complaints, (2) dealership repair records, (3) records from NHTSA, (4) warranty and post-warranty claims, (5) durability testing and part sales, and (6) other various sources.

## C.   **KMA's Warranty-Related Practices**

88.   KMA issued two relevant warranties with each Class Vehicle: a "New Vehicle Limited Warranty," and a "Powertrain Warranty."

89.   Under the basic New Vehicle Limited Warranty, KMA agreed to repair defects reported within the earlier of 5 years or 60,000 miles.

90.   Under the Powertrain Warranty, KMA agreed to repair defects affecting various powertrain components through 10 years and 100,000 miles.  According to the Warranty and Consumer Information Manual, Powertrain Coverage Components include:

**In the Engine:** Cylinder block, cylinder head and all internal parts, timing gear, seals and gaskets, valve cover, flywheel, oil pump, water pump and turbo charger.

**In the Transaxle:** Transmission case and all internal parts, torque converter, drive shafts, universal joints, front hubs, bearings, seals and gaskets.
**In the Transmission**: Transmission case, transfer case, torque converter and all internal parts, seals, and gaskets.[9]

91.   KMA instructs vehicle owners and lessees to bring their vehicles to a Kia dealership for the warranty repairs.  Many owners and lessees have presented Class Vehicles to Kia dealerships with complaints related to the engine defect.

92.   KMA has evaded its warranty obligations by failing to tell consumers that their vehicles are defective and by representing that the cause of the defect is the owner's neglect to properly maintain the engine oil and/or engine oil level.  This representation, however, is false as the engine is inherently defective and will inevitably fail.

93.   In addition, KMA has also evaded its warranty obligations by requiring consumers to produce the entire maintenance history of the Class Vehicles, including a mandate that all oil changes be completed at a Kia dealership, before determining whether to make the necessary repairs under warranty.  KMA, however, knows that the defect in the Class Vehicles' engines manifests even if the owner or lessee has followed Kia's oil change guidelines.  Even if consumers produce their vehicles' maintenance

---

[9] *See, e.g.*, http://www.kia.com/us/k3/content/media/all/warranty/2014_warranty.pdf (last visited Mar. 9, 2016).

CLASS ACTION COMPLAINT

history, KMA blames the defect and engine failure on the consumer, refuses to cover the necessary repairs under warranty, and charges as much as $10,000 to repair/replace the engine.

94. Kia also advertises that it offers "an industry-leading Kia 10-year or 100,000-mile warranty program." With respect to the powertrain warranty, however, Kia publicizes the existence of 10 year/100,000 mile powertrain warranty but fails to mention that subsequent owners only receive powertrain warranty coverage for 5 years/60,000 miles. As such, subsequent owners are left to discover the limited warranty coverage after purchasing their vehicle. Kia's failure to cover repairs under the powertrain warranty between 5 years/60,000 miles and 10 years/100,000 miles is therefore unconscionable and unenforceable. A typical Kia advertisement touting its warranty is pictured below:



95. In many instances, consumers have incurred and will continue to incur expenses for the diagnosis of the defect, despite such defect having been contained in the Class Vehicles when manufactured by Defendant, repair and replacement of the GDI Engine and the unnecessary and premature replacement of the connecting rods, crank shaft, oil pump, and other engine components.

96. Furthermore, a number of Class Members, who presented their Class Vehicles to Kia dealerships because of issues related to the defective connecting rod

bearings and insufficient engine oil lubrication channels, were denied warranty repairs and, instead, informed that nothing was wrong with their vehicles.  As a result, after expiration of the warranty period, Class Members are forced to pay costly repairs to correct the defect.

## CLASS ALLEGATIONS

97.     Plaintiffs bring this action on their own behalf, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3).

### Nationwide Class:

All persons or entities in the United States who are current or former owners and/or lessees of a Class Vehicle.

98.     In the alternative to the Nationwide Class, and pursuant to Federal Rule of Civil Procedure 23(c)(5), Plaintiffs seek to represent the following state classes only in the event that the Court declines to certify the Nationwide Class above.  Specifically, the state classes consist of the following:

### California Class:

All persons or entities in California who are current or former owners and/or lessees of a Class Vehicle for primarily personal, family or household purposes, as defined by California Civil Code § 1791(a).

### Illinois Class:

All persons or entities in Illinois who are current or former owners and/or lessees of a Class Vehicle.

99.     Together, the California Class, Illinois Class and the Nationwide Class shall be collectively referred to herein as the "Class."  Excluded from the Class are KMA, its affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case.  Plaintiffs reserve the right to modify, change, or expand the Class definitions based on discovery and further investigation.

100.     Numerosity:  Upon information and belief, the Class is so numerous that joinder of all members is impracticable.  While the exact number and identities of

-34-

individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that hundreds of thousands of Class Vehicles have been sold and leased in each of the States that are the subject of the Class.

101.   Existence and Predominance of Common Questions of Fact and Law: Common questions of law and fact exist as to all members of the Class.  These questions predominate over the questions affecting individual Class Members.  These common legal and factual questions include, but are not limited to, whether:

    a.  The Class Vehicles were sold with a defect;

    b.  KMA knew of the defect but failed to disclose the problem and its consequences to its customers;

    c.  A reasonable consumer would consider the defect or its consequences to be material;

    d.  KMA has failed to provide free repairs as required by its New Vehicle Limited Warranty and/or Powertrain Warranty;

    e.  KMA should be required to disclose the existence of the defect; and

    f.  KMA's conduct violates the California Legal Remedies Act, California Unfair Competition Law, and the other statutes asserted herein.

102.   Typicality:  All of Plaintiffs' claims are typical of the claims of the Class since Plaintiffs each purchased a Class Vehicle with the engine defect, defective vehicle design, and defective engine, as did each member of the Class.  Furthermore, Plaintiffs and all members of the Class sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendant's wrongful conduct.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class Members.

103.   Adequacy:  Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Class that she seeks to represent, she has retained counsel competent and highly experienced in complex class action litigation, and she intends to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

-35-

104.    Superiority:  A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class.  The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant KMA's conduct.  It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.  Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendant's vehicle identification numbers, warranty claims, registration records, and database of complaints.

105.    Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ("CLRA") (Cal. Civ. Code § 1750, *et seq.*)

## (On Behalf of the Nationwide Class or, Alternatively, the California Class)

106.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

107.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Members of the Nationwide Class against KMA.  Alternatively, Plaintiff Wallis brings

this claim on behalf of himself and on behalf of the Members of the California Class against KMA.

108.   KMA is a "person" as that term is defined in California Civil Code § 1761(c).

109.   Plaintiffs and the Class are "consumers" as that term is defined in California Civil Code § 1761(d).

110.   KMA engaged in unfair and deceptive acts in violation of the CLRA by the practices described above, and by knowingly and intentionally concealing from Plaintiff Wallis and Class Members that the Class Vehicles suffer from a defect(s) (and the costs, risks, and diminished value of the vehicles as a result of this problem).  These acts and practices violate, at a minimum, the following sections of the CLRA:

(a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;

(a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

(a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

(a)(9) Advertising goods and services with the intent not to sell them as advertised.

111.   KMA's unfair or deceptive acts or practices occurred repeatedly in KMA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

112.   KMA knew that the Class Vehicles and GDI Engines were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

113.   KMA was under a duty to Plaintiffs and the Class Members to disclose the defective nature of the Class Vehicles and the defective nature of the connecting rod bearings and insufficient engine oil lubrication channels because:

-37-

a.  KMA was in a superior position to know the true state of facts about the safety defect and associated repair costs in the Class Vehicles and their engines;

b.  Plaintiffs and the Class Members could not reasonably have been expected to learn or discover that the Class Vehicles and their engine had dangerous safety defect until manifestation of the defect;

c.  KMA knew that Plaintiffs and the Class Members could not reasonably have been expected to learn or discover the safety and security defect and the associated repair costs that it causes until the manifestation of the defect; and

d.  KMA actively concealed the safety and security defect and the associated repair costs by asserting to Plaintiffs and Class Members that the cause of their engine problems was due to Plaintiffs and the Class Members' inability to maintain the proper engine oil levels despite knowing the repairs needed to correct the defect.

114.  In failing to disclose the engine defect and the associated safety risks and repair costs that result from it, KMA has knowingly and intentionally concealed material facts and breached its duty not to do so.

115.  The facts concealed or not disclosed by KMA to Plaintiffs and the Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase KMA's Class Vehicles or pay a lesser price. Had Plaintiffs and the Class known about the defective nature of the Class Vehicles and their engines, they would not have purchased the Class Vehicles or would have paid less for them.

116.  Plaintiffs' and the other Class Members' injuries were proximately caused by Defendant's fraudulent and deceptive business practices.

117.  Plaintiffs seek restitution and injunctive relief pursuant to California Civil Code § 1780.

-38-

## SECOND CAUSE OF ACTION

## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW

### (Cal. Bus. & Prof. Code § 17200)

### (On Behalf of the Nationwide Class or, Alternatively,
### the California Class)

118.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

119.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Members of the Nationwide Class against KMA.  Alternatively, Plaintiff Wallis brings this claim on behalf of himself and on behalf of the Members of the California Class against KMA.

120.    The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.

121.    KMA has engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiffs and the Class Members that the Class Vehicles suffer from a defect (and the costs, safety risks, and diminished value of the vehicles as a result of these problems).  KMA should have disclosed this information because they were in a superior position to know the true facts related to the defect, and Plaintiffs and Class Members could not reasonably be expected to learn or discover the true facts related to the defect.

122.    The defective connecting rod bearings and insufficient engine oil lubrication channels constitute a safety issue that triggered KMA's duty to disclose the safety issue to consumers.

123.    These acts and practices have deceived Plaintiffs and are likely to deceive the public.  In failing to disclose the defect and suppressing other material facts from Plaintiffs and the Class Members, Defendant breached its duties to disclose these facts,

-39-

violated the UCL, and caused injuries to Plaintiffs and the Class Members.  The omissions and acts of concealment by KMA pertained to information that was material to Plaintiffs and the Class Members, as it would have been to all reasonable consumers.

124.    The injuries suffered by Plaintiffs and the Class Members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and the Class Members should have reasonably avoided.

125.    KMA's acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750 *et seq.*, and California Commercial Code § 2313.

126.    Plaintiffs seek to enjoin further unlawful, unfair and/or fraudulent acts or practices by KMA, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## THIRD CAUSE OF ACTION

### VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW

### (Cal. Bus. & Prof. Code §§ 17500, *et seq.*)

### (On Behalf of the Nationwide Class or, Alternatively,

### the California Class)

127.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

128.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Members of the Nationwide Class against KMA.  Alternatively, Plaintiff Wallis brings this claim on behalf of himself and on behalf of the Members of the California Class against KMA.

129.    California Business & Professions Code § 17500 states:  "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any

-40-

other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

130.   KMA caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to KMA, to be untrue and misleading to consumers, including Plaintiffs and the other Class Members.

131.   KMA has violated section 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of its Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

132.   Plaintiffs and the other Class Members have suffered an injury in fact, including the loss of money or property, as a result of KMA's unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Class Vehicles, Plaintiffs and the other Class Members relied on the misrepresentations and/or omissions of KMA with respect to the safety and reliability of the Class Vehicles.  KMA's representations were untrue because the Class Vehicles are distributed with defective connecting rod bearings and insufficient engine oil lubrication channels.  Had Plaintiffs and the other Class Members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.  Accordingly, Plaintiffs and the other Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

133.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of KMA's business.  KMA's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

134.   Plaintiffs, individually and on behalf of the other Class Members, request that this Court enter such orders or judgments as may be necessary to enjoin KMA from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs

-41-

and the other Class Members any money KMA acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## FOURTH CAUSE OF ACTION

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD
### AND DECEPTIVE TRADE PRACTICES ACT
### (815, ILCS 505/1, *et seq.*)

### (On Behalf of the Illinois Class)

135.   Plaintiff Peltier and the Class hereby incorporate by reference the allegations of all foregoing Paragraphs as if such had been set forth in full herein.

136.   Plaintiff Peltier brings this claim on behalf of herself and on behalf of the Members of the Illinois Class against KMA, pursuant to the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815, ILCS 505/1, *et seq.* ("ICFA").

137.   At all times relevant herein, the ICFA was in effect.  The ICFA prohibits "unfair and deceptive practices."

138.   Plaintiff Peltier and members of the Class are consumers.

139.   Plaintiff and Class Members reasonably expected their Class vehicles to last well beyond the original warranty period.  Most automobiles continue to operate without major drivetrain failure well beyond such durational limitations.

140.   Defendant KMA developed, manufactured, marketed and sold the Class vehicles. The Class vehicles are defective since they are predisposed to defects that result in serious and expensive damage to, and/or catastrophic failure of the GDI Engines.

141.   Defendant was aware that the Class vehicles suffered from a common defect resulting in engine problems, but failed to disclose this to Plaintiff and Class Members.  Defendant also marketed these vehicles as being of superior quality when the class vehicles contained a known defect.  These affirmative misrepresentations were material to the vehicle purchases, and were false statements of fact.

142.   Upon information and belief, Defendant, through (1) their own records of customer complaints, (2) dealership repair records, (3) records from the National

Highway Traffic Safety Administration (NHTSA), and other various sources, including their own durability testing, were well aware of the alarming failure rate of the GDI Engines within the Class vehicles.  Regardless, Kia failed to notify customers of the nature and extent of the problems with the GDI Engines while also failing to provide any adequate remedy.  Despite such knowledge, KMA continued to manufacture and market the Class vehicles with the GDI Engine defects.

143.    Despite Defendant's knowledge of the defect in the Class vehicles, Defendant has refused to disclose the existence of this defect (a material fact) to Plaintiff and members of the Class at the times each of them purchased their vehicles or thereafter.

144.    Defendant intended, and continues to intend, that the Plaintiff and Class Members rely on the omission that the Class vehicles contain a defect.

145.    In failing to inform consumers of the defect, Defendant KMA has engaged in an unfair or deceptive act prohibited by the ICFA.

146.    As a proximate cause of the Defendant's violation of the ICFA, Plaintiff and members of the Class were injured.

147.    If not for Defendant's deceptive and unfair act of concealing from Plaintiff and members of the Class the existence of the defect in the Class vehicles, Plaintiff and members of the Class would not have purchased the Class vehicles.  Defendant, at all relevant times, knew or should have known that Plaintiff and members of the Class did not know or could not have reasonably discovered the defect prior to their purchases.

148.    By paying monies for the Class vehicles that contain a defect, Plaintiff and members of the Class have suffered an ascertainable loss.

149.    Defendant's violation of the ICFA entitles Plaintiff and members of the Class under the statute to statutory and actual damages, punitive damages, injunctive relief, and attorneys' fees and costs.

//
//
//

-43-

# FIFTH CAUSE OF ACTION

## BREACH OF EXPRESS WARRANTY

### (On Behalf of the Nationwide Class or, Alternatively,
### the California and Illinois Classes)

150.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

151.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Members of the Nationwide Class against KMA.  Alternatively, Plaintiff Wallis brings this claim on behalf of himself and on behalf of the Members of the California Class against KMA, and Plaintiff Peltier brings this claim on behalf of herself and on behalf of the Members of the Illinois Class against KMA.

152.    KMA provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain. Accordingly, Defendant's warranties are express warranties under state law.

153.    The parts affected by the defect, including the rotating assembly and engine block, were distributed by KMA in the Class Vehicles and are covered by the warranties KMA provided to all purchasers and lessors of Class Vehicles.

154.    KMA breached these warranties by selling and leasing Class Vehicles with the defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

155.    Plaintiffs notified KMA of the breach within a reasonable time, and/or was not required to do so because affording KMA a reasonable opportunity to cure its breach of written warranty would have been futile.  KMA also knew of the defect and yet have chosen to conceal it and to fail to comply with their warranty obligations.

156.    As a direct and proximate cause of KMA's breach, Plaintiffs and the other Class Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles

-44-

suffered a diminution in value.  Plaintiffs and Class Members have also incurred and will continue to incur costs related to the diagnosis and repair of the defective connecting rod bearings and insufficient engine oil lubrication channels.

157.    KMA's attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, KMA's warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

158.    The time limits contained in Defendant KMA's warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Class.  Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations the terms of which unreasonably favored KMA.  A gross disparity in bargaining power existed between KMA and the Class Members, and KMA knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

159.    Plaintiffs and the Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

## SIXTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY

**(On Behalf of the Nationwide Class or, Alternatively,
the California and Illinois Classes)**

160.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

161.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Members of the Nationwide Class against KMA.  Alternatively, Plaintiff Wallis brings this claim on behalf of himself and on behalf of the Members of the California Class against KMA, and Plaintiff Peltier brings this claim on behalf of herself and on behalf of the Members of the Illinois Class against KMA.

162.    KMA was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.  KMA knew or had reason to know of the specific use for which the Class Vehicles were purchased.

163.    KMA provided Plaintiffs and the other Class members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia*, the Class Vehicles and their engines suffered from defective connecting rod bearings and insufficient engine oil lubrication channels at the time of sale that causes the vehicles to experience premature and catastrophic engine failure.  Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

164.    KMA impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by KMA were safe and reliable for providing transportation and would not experience premature and catastrophic engine failure; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

165.    Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and the other Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles suffer from a defective design(s) and/or manufacturing defect(s).

166.    Defendant KMA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

//

//

-46-

## SEVENTH CAUSE OF ACTION

### BREACH OF WRITTEN WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT

### (15 U.S.C. § 2301, *et seq.*)

### (On behalf of the Nationwide Class or, Alternatively,
### the California and Illinois Classes)

167.　Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

168.　Plaintiffs bring this claim on behalf of themselves and on behalf of the Members of the Nationwide Class against KMA.  Alternatively, Plaintiff Wallis brings this claim on behalf of himself and on behalf of the Members of the California Class against KMA, and Plaintiff Peltier brings this claim on behalf of herself and on behalf of the Members of the Illinois Class against KMA.

169.　Plaintiffs and the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

170.　Defendant KMA is a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

171.　The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

172.　Defendant KMA's 5 year/60,000 miles Basic Warranty and 10 year/100,000 miles Powertrain Warranty are "written warranties" within the meaning of 15 U.S.C. § 2301(6).

173.　Defendant KMA breached the express warranties by:

　　　　a.　　Providing a 5 year/60,000 miles Basic Warranty and a 10 year/100,000 miles Powertrain Warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

-47-

b.      Selling and leasing Class Vehicles with engines that were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

c.      Refusing and/or failing to honor the express warranties by repairing or replacing, free of charge, the engine or any of its component parts in order to remedy the defective connecting rod bearings and insufficient engine oil lubrication channels.

174.    Plaintiffs and the other Class Members relied on the existence and length of the express warranties in deciding whether to purchase or lease the Class Vehicles.

175.    Defendant KMA's breach of the express warranties has deprived the Plaintiffs and the other Class Members of the benefit of their bargain.

176.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25.00.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

177.    Defendant KMA has been afforded a reasonable opportunity to cure its breach of the written warranties and/or Plaintiffs and the other Class Members were not required to do so because affording KMA a reasonable opportunity to cure its breach of written warranties would have been futile.  Defendant KMA was also on notice of the alleged defect from the complaints and service requests it received from Class Members, as well as from its own warranty claims, customer complaint data, and/or parts sales data.

178.    As a direct and proximate cause of KMA's breach of the written warranties, Plaintiffs and the other Class Members sustained damages and other losses in an amount to be determined at trial.  Defendant KMA's conduct damaged Plaintiffs and the other Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, including statutory attorney fees and/or other relief as deemed appropriate.

## EIGHTH CAUSE OF ACTION

### COMMON LAW FRAUD

**(On Behalf of the Nationwide Class or, Alternatively,**
**the California and Illinois Classes)**

179.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

180.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Members of the Nationwide Class against KMA.  Alternatively, Plaintiff Wallis brings this claim on behalf of himself and on behalf of the Members of the California Class against KMA, and Plaintiff Peltier brings this claim on behalf of herself and on behalf of the Members of the Illinois Class against KMA.

181.   KMA made material omissions concerning a presently existing or past fact. For example, KMA did not fully and truthfully disclose to its customers the true nature of the inherent defect with the GDI Engine, which was not readily discoverable until years later, often after the New Vehicle Limited Warranty or the Powertrain Warranty has expired.  As a result, Plaintiffs and the other Class Members were fraudulently induced to lease and/or purchase the Class Vehicles with the said defect and all of the resultant problems.

182.   These omissions were made by KMA with knowledge of their falsity, and with the intent that Plaintiffs and the Class Members rely on them.

183.   Plaintiffs and the Class Members reasonably relied on these omissions, and suffered damages as a result.

## NINTH CAUSE OF ACTION

### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

**(On Behalf of the Nationwide Class or, Alternatively,**
**the California and Illinois Classes)**

184.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

-49-

185.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Members of the Nationwide Class against KMA.  Alternatively, Plaintiff Wallis brings this claim on behalf of himself and on behalf of the Members of the California Class against KMA, and Plaintiff Peltier brings this claim on behalf of herself and on behalf of the Members of the Illinois Class against KMA.

186.   All contracts in California and Illinois contain an implied covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

187.   KMA breached the covenant of good faith and fair dealing by, *inter alia*, failing to notify Plaintiffs and Class Members of the defective connecting rod bearings and insufficient engine oil lubrication channels in the Class Vehicles, and failing to fully and properly repair this defect.

188.   KMA acted in bad faith and/or with a malicious motive to deny Plaintiffs and the Class Members some benefit of the bargain originally intended by the parties, thereby causing them injuries in an amount to be determined at trial.

## TENTH CAUSE OF ACTION

### VIOLATION OF THE SONG-BEVERLY ACT – BREACH OF IMPLIED WARRANTY

**(Cal. Civ. Code §§ 1792, 1791.1, *et seq.*)**

**(On Behalf of the Nationwide Class or, Alternatively, the California Class)**

189.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

190.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Members of the Nationwide Class against KMA.  Alternatively, Plaintiff Wallis brings this claim on behalf of himself and on behalf of the Members of the California Class.

-50-

191.   At all relevant times hereto, KMA was the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.  KMA knew or should have known of the specific use for which the Class Vehicles were purchased.

192.   KMA provided Plaintiffs and the Class Members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold.  The Class Vehicles, however, are not fit for their ordinary purpose because, *inter alia*, the Class Vehicles and their engines suffered from an inherent defect at the time of sale that causes the Class Vehicles to experience premature and catastrophic engine failure.

193.   The Class Vehicles are not fit for the purpose of providing safe and reliable transportation because of the defect.

194.   KMA impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use.  This implied warranty included, *inter alia*, the following: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by Kia were safe and reliable for providing transportation and would not prematurely and catastrophically fail; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use – providing safe and reliable transportation – while the Class Vehicles were being operated.

195.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose.  Instead, the Class Vehicles are defective, including, but not limited to, the engine defect and/or manufacture of the GDI Engines.

196.   KMA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

//

//

//

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully requests that this Court:

A. determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

B. appoint Plaintiffs as the representative of the Class and their counsel as Class counsel;

C. award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and the Class Members are entitled (though such damages are expressly not currently sought under the CLRA cause of action);

D. award pre-judgment and post-judgment interest on such monetary relief;

E. grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires KMA to repair, recall, and/or replace the Class vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class Members with appropriate curative notice regarding the existence and cause of the engine defect;

F. award reasonable attorneys' fees and costs; and

G. grant such further relief that this Court deems appropriate.

Dated:  June 2, 2016                              Respectfully submitted,


By:   */s/ Richard D. McCune*
Richard D. McCune
David C. Wright
**MCCUNEWRIGHT LLP**
2068 Orange Tree Lane
Suite 216
Redlands, California 92374
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

-52-

CLASS ACTION COMPLAINT

Email: rdm@mccunewright.com
dcw@mccunewright.com

Joseph G. Sauder[*]
Matthew D. Schelkopf[*]
Joseph B. Kenney[*]
**MCCUNEWRIGHT LLP**
1055 Westlakes Drive, Suite 300
Berwyn, Pennsylvania 19312
Telephone: (909) 557-1250
Email: jgs@mccunewright.com
mds@mccunewright.com
jbk@mccunewright.com

[*]*Pro Hac Vice Applications to be Submitted*

Attorneys for Plaintiffs and Putative Class

## JURY DEMAND

Plaintiffs, on behalf of themselves and the putative Class, demands a trial by jury on all issues so triable.

Dated:  June 2, 2016          By:   */s/ Richard D. McCune*
Richard D. McCune
MCCUNEWRIGHT LLP
Attorneys for Plaintiffs and Putative Class

-53-

CLASS ACTION COMPLAINT